Here ye, here ye, here ye, this Honorable Appellate Court, 2nd District, is back in session. Pursuant to adjournment, the Honorable Lisa F. Hutchinson is out. Please be seated. Your Honor, the second case this morning is called Fiala v. Wasco Sanitary District and D&D Enterprises. On behalf of Mr. Fiala, Mr. James P. Newman, on behalf of Wasco, Mr. David J. Bressler, and Mr. Patrick Collins, on behalf of D&D Enterprises. On behalf of the appellees, I'd like you to split your time 12 minutes to Wasco, 3 minutes to D&D. Or something in that general vicinity. All right, good morning, gentlemen. This is my tablet. I have some cases that I'll be referring to, so I'm not playing solitaire, trust me. And I didn't have a copier available, so I apologize. All right, if you're ready, Mr. Newman. May it please the Court, Jim Newman on behalf of the plaintiff. I'd like to reserve 3 minutes time for one more question. This country, you know, this case is about standing. And that's the issue before this case. And it's a 2619 motion, so the only thing the Court can look at are the allegations in the complaint. And in trying to figure out a way to address this, this issue in front of the Court, I go back to when we all were in law school, and probably even before law school, and learned about the founding fathers and the Constitution and tyranny. And this is a case, you know, when you hear the word tyranny and you think about the founding fathers, you think about the Revolutionary War, but tyranny is a lot more than shooting people and taxes without representation and such. I'm going to suggest to the Court that tyranny is also theft by the government or sanctioned by the government. And that's what this case is about. It might be once and if we get by this first issue of standing, which is really the only issue that we have before us right now. So let's save some of our editorializing for a later time if we could. Well, that's my segue into what the standing issue is. And really what we're talking about standing in this case, we're talking about the public trust doctrine. And I bring up tyranny because back, you know, well over 100 years ago, the U.S. Supreme Court in the Illinois Central case, which is a seminal case on the public trust doctrine, that's what we're dealing with here. We're talking about theft of government property or misuse of government property. I think in particular they said the redirection of public property, which I think might be a better term to use for purposes of our discussion. Okay. Well, we can use the word redirection, but I think in this case and what's been alleged in the complaint, falls more in line with theft because this was a conscious decision made by a group of people to redirect funds, which they knew they could not do, into private, you know, over $12 million into a private entity. And when we get to standing and you look at the case law, standing is actually pretty simple. It's whether or not the person, in this case Ed Fiala, whether or not he has an interest in the litigation and whether or not he'll receive a benefit from its outcome. And from a public trust standpoint, if you look at the case law, the only thing that needs to be alleged, and again, alleged, not proven, alleged, is that just that, that he had an interest, that there's a public arrest or whether it's property or money, whatever it is, public property, that Mr. Fiala has an interest in and that interest is being improperly disposed of. How did he have his interest? What was his interest, if you can explain it? As a taxpayer, he has an interest in the public coffers. And that's the Mueller case that I cite. I don't think there could be a case that I've ever argued in front of the appellate court that's more on point than the Mueller cases on this case. Well, Mueller is a little different than here because then you had a set price there on Mueller, didn't you? I mean, with respect to the water? You had money, yeah. What is a set price? We had a set price here, too. You had a set price that everybody had to pay a connection fee in order to get Wasco Sanitary District products. That set price varied depending on what year it was. It kept going up and up and up and up, but there's a set price there. This case differs than Mueller in one major regard, and that goes back to what Your Honor had said, whether or not it's misappropriation or theft, whatever it may be. In Mueller, there were records. And in this case, and I said public records. In this case, there are no public records. They have violated the law on everything that they did here. There are no public records on the expenditures. Well, there's one, I should say. There's one document regarding expenditures.  Okay, but let's stay focused on the standing. Do you have to or does your client have to allege that he will be directly benefited by this decision or that there has just been this misappropriation or misdirection that needs to be righted? I mean, does he have to? You're talking about there may be a dollar figure. I think you've alleged $12 million. Over $12 million. Over $12 million, well, we've been able to trace so far. I mean, is your client saying that he's going to get back some of that $12 million for himself, or does he have to say that? No, he does not have to say that. In fact, the case law says just that. The Illinois Supreme Court has said there doesn't have to be a special injury. Public trust, his interest is in the public coffers. It's taxes. $12 million goes back into the Wasco Sanitary District. That means that the Wasco Sanitary District, instead of charging $200 a month for water, which is what it charges now, the water is going to be more in line with what you pay in Elgin, which is $30 a month. All that money should be spent on the infrastructure and all the expenses and lowering the cost. And Ed Fiala, like all the other customers in the Sanitary District, had to pay that fee. Everyone who builds in the Sanitary District has to pay a connection fee. The problem is the fee was going to B&B. And there is no set of circumstances from a factual standpoint that B&B could ever touch this money. They non-title reimbursement, non-title any, that's all alleged in the complaint. So the issue becomes where does that money go and what is Fiala's interest? And Fiala's interest as a taxpayer, as the Mueller case says, is he has an interest in the rest or the funds. He has an interest in those funds. So he only has to show that he's affected by it in order to have standing. Correct. That's the Mueller case says that. And there's another case that the case that was relied upon by the judge below and is relied upon heavily by the defendants here, the Lyons case. And their argument is, you know, the real interest here, party of interest is the Sanitary District and not Fiala. But the Lyons case does not stand for that proposition. Well, it does on those facts, but it doesn't apply at all here. And I want to draw this Court's attention. I think there was a decision in the First District that distinguishes Lyons, and it goes four or five pages. And it's a very good decision. And one that I would recommend that the Court look at, it's the case of Crucius v. Illinois Gaming. And that's 807 Northeast 2nd 1207. It's a First District case. And it makes the distinction of Lyons case, which this Court can easily make here. Lyons involved money that was being used for political contributions. And what the plaintiff in Lyons was asking the Court to do is to create a trust out of those funds and that they should have belonged to the public. And the Court said no, you cannot, the public trust doctrine cannot be used in such a circumstance. That the real party of interest in the case would be the municipality because those funds were never, and very specifically, were never meant to go into the public coffers. That's not what we have here. In fact, this case is more like Mueller, where the money from the sale of the water was supposed to go into the coffers of Highland Park, and it didn't. And that's where the Court said he has standing, the plaintiff in that case has standing. Just as in the case of Crucius is the same issue. That was against the Illinois Gaming Commission. And it was the same situation. And the Court found standing because the funds to be used were public funds. And that's all that's necessary under the public trust doctrine. And this case can be summarized in maybe kind of a negative. If Ed Fiala doesn't have standing, or someone like Ed Fiala doesn't have standing in a case like this, who does? Well, I think one of the issues would be Wasco Sanitary District. And so why shouldn't they take on their own issues? Well, they can. The problem is that the complaint alleges that the Wasco Sanitary District was conspiring with the defendants to do this. That's with the old board of directors, right? Or trustees or whatever you want to call it. No, there's no distinction in the complaint. That's a distinction that the Wasco Sanitary District has attempted to make, but that's not what the complaint says. Because those trustees aren't there anymore. No, there's one trustee still there. There are two new trustees, but nothing has been done to date to collect this money. And that's alleged in the complaint as well. And, in fact, they have said publicly that they're not going to collect the money. And even if they did, I cite case law in my brief that says that even if they wanted to do that, the proper course is to have them, if they want to file a complaint, to have the cases filed parallel with one another. It does not mean that Ed Fiala's claim would be dismissed. But they haven't made that argument because they have not filed any lawsuit to get back the $12 million. And they're not going to. I don't know that they even could now because I don't think that the statute of limitations on their claim, because they're not going to be able to piggyback on our claim. I think it's expiring. So it's either Ed Fiala or nothing. How did the trial court get to the issue of the recovery of fraudulently obtained public funds when you didn't allege that, did you? You're not alleging under that act, are you, the recovery of fraudulently obtained public funds? That is a strange one. The Wasco Sanitary District filed a motion to dismiss, and they cited this statute, which I didn't cite. I didn't bring my cause of action to the case. You didn't plead it. I did not plead it. It was found unconstitutional. And the court originally found that the act applied and that my client failed to comply with the act and therefore dismissed the original complaint. I didn't make the argument, but okay. So we then complied with the statute. When we complied with the statute, the Sanitary District in B&B, within 30 days, filed a motion with the court to vacate its previous order and to change the order, because originally the court below said we didn't comply with the statute, therefore no standing. So we complied with the statute. Then the court below said statute doesn't apply, no standing. They changed their – the court changed the basis of its opinion. But my contention all along has been that that act, number one, doesn't even apply to this case because it deals with compensation. But we didn't allege it. And it's – Well, it does have a rather broad term at the very end or any – something like any similar – I don't have it directly in front of me, but any similar remuneration or something like that. But you're saying that it just involves, in your opinion, compensation for like wages or something of that nature. Correct. And we didn't sue on it. And I think the Supreme Court in the Pappett case, which is 46 Gold Second, 330, it says specifically – but this was decided before the act. I think it was 1990, the Pappett case, or 70. 70. But it says very specifically that the public trust doctrine is not dependent upon the statute. It's what the case says. And it never has been. It is a common law cause of action. I don't understand why the Waspa Sanitary District would have raised the issue because I didn't raise it. But I suspect, although they don't want to come out and say it, I suspect their argument – and he'll have a chance to address this – but I suspect his argument is that there was this common law cause of action for the public trust doctrine. The Illinois legislature then adopts a statute which encompasses the cause of action. The Supreme Court says that the statute's unconstitutional. Therefore, there's no longer a public trust doctrine. He doesn't say that, but I suspect that's what his argument is. And I think that's a little ridiculous because the case law doesn't say that, and you're not going to get rid of the public trust doctrine because a statute was found unconstitutional. And, again, I go back to if Ed Fiala, in a case like this, doesn't have standing, then nobody does. And the fact that the Waspa Sanitary District could, when they're part of the scheme as they are here, and they've told the public we're not going to collect this money, then you have tyranny because you have the government that is taking public property, giving it to a private individual without any records. And that's why I mentioned this is what makes this case kind of unique. The records that we have in this case are all from third parties with canceled checks. They never went through the sanitary district, which they would be required to do under the act that the sanitary district says may apply. But they'll even concede that if this act, which doesn't apply, were to apply, the money here, the $12 million, would have had to have gone through the sanitary district and paid out in reimbursement. And our position is that act doesn't apply at all. Is there anything in the decision of the federal court remanding these claims back to the state court that would impact the question of standing? In favor of Ed Fiala, absolutely, because the argument that was made in the federal court was that there was no standing for any cause of action. And the federal court said there's no standing for RICO. We are going to remand the state law claims for that. And that's one of the mistakes that the lower court here made, is they relied upon language in the federal case, in the RICO action, where the judge said the sanitary district is the victim here. That was the victim in the RICO claim. The RICO claim was pled in the alternative to the public trust claims because they are in opposite of one another as far as who's the party of interest. And so you have the RICO claim in which it's alleged that the district is really the party of interest. And then you've got the public trust doctrine, which is alleged that the taxpayer is the party of interest. And it was done that way because the documents in this case, and there are boxes and boxes of documents, where the Wasco Sanitary District and B&B, when they're sending e-mails back and forth, they were trying to figure out ways to call PEs or whatever it may be, different things. Who owned it? Who owned it? And they were changing, which are attached to my complaint, they were actually changing the way they referenced this, I think, to avoid this type of circumstance. Because of that, because there was a question in my mind on who really owned the PEs, if you will, we filed that in the alternative. And when the federal court said we're going to remand the state law cause of action for determination on state law claims, that's what he was meant. That would have no impact whatsoever on the state law claims. Otherwise, he would have dismissed them, which he would have had the right to do. And he specifically did not, despite the request of the parties to do so. I see my time is up. I don't know if there's any other questions I can address in the debate. You'll have an opportunity to do so. Thank you. Thank you. Mr. Griffin or Mr. Bressler, who wants to go first? Mr. Bressler. Thank you. May it please the court, counsel? This case- Who do you represent? I'm sorry, I represent the Wasco Sanitary District only in this case. And as the clerk indicated, three minutes is going to be reserved for Mr. Griffin primarily to address the issue of whether the dismissal is on the merits. I think that's what his argument is going to be limited to. Obviously, you can ask him whatever you want. The question here is not whether this is a public trust case. It is whether this is a taxpayer claim or a claim as to which the governmental entity is the true party in interest. And this is a city case. And I apologize on the pronunciation. They call such claims taxpayer derivative actions, and that's a lot easier to say. Why isn't this a public trust issue? Because we have property. Mr. Fiala is a resident of the area covered by this. He is paying, and he is interested in the money that is being paid. And we have to take his allegations as true at this point in the proceedings that he has made. He is alleging a misdirection of those funds. So why is that not a public trust issue? Let's figure out, first of all, how we get to the public trust issue. Before you have a public trust issue, you have to have two things. I'm reading from the Cichitti case. Taxpayer derivative suit is where the state's the real party in interest. A taxpayer case is where the taxpayer is entitled to the benefits if the action is successful and, therefore, has an actual and substantial interest, as distinguished from one who only has a nominal interest in litigation. So I would submit first, Your Honor, that Mr. Fiala's interest here is nominal only. Why is it nominal only? First of all, what is the property that's being characterized here? In order to have public trust, property held for the trust of the public, you have to have the property. If you go to the plaintiff's complaint, they don't know. They say it's either P.E.s or it's connection fees, and at the end of the day, they call it stuff. The fees in question that they're claiming are bribes that they've alleged have been paid to secure the permits. And there's one of the cases that I said, Your Honor, I don't recall which one it is right now, but a bribe would never go to the district. So how would that ever be properly routed through the district? The problem here is that they create this construct that says the district would charge these fees that were paid to the owners of the connection permits to buy those connection permits. But they allege that those are bribes and kickbacks and fees. Bribes and kickbacks and fees are not property of the district. The other thing that we don't have here is tax revenues. Again, the public trust or taxpayer cases that have been allowed to go forward. For example, the Malik case. I'm sorry, Your Honor. What are the connection fees considered? So the connection fees, when the annexation agreement was executed, a certain number of permits or capacity was allocated to the developer. And those were, by the way, connection permits. Every time a house got constructed, basically the homeowner bought the permit, bought that part of the ability to annex into the district. So if it's not necessarily a tax, wouldn't it be considered an assessment, which is really similar to a tax? Except that the district was not the entity that constructed the system. So that's why I say what he hasn't alleged is that the district would have charged these fees. You have permit owners. The owners of the permits sold those permits to the homeowner. It's not a tax. It's not a misuse of tax revenue. Again, which is what the Malik case talked about for taxpayer suits. What is the Wasco Sanitary District then? It's an Illinois special district, the sanitary district. And it doesn't own anything? When the annexation agreement occurred, when the developer donated or transferred the infrastructure to the district, and in exchange, the district said you have the right to connect X number of lots, houses, whatever, into the district. And those were represented by the connection permits then? Those then were otherwise also, they were transferred beyond that first transfer group. So what happens is you have a developer who has 3,500 PEs of capacity. Every time a house is sold, 3.5, that number is reduced by 3.5 PEs until you get to the level that there's no more capacity. So basically a homeowner is buying that connection permit from the owner of the connection permit, which under the annexation agreement is the developer. But B and B had more, they had capacity left that they then passed on in some fashion to Harrison, or is it vice versa? That's correct. Yes. I'm sorry. Then when they hook up, then they're paying the water to the sanitary district? Absolutely, and that's what distinguishes this from the Mueller case. Because in the Mueller case, they said you're not paying what you agreed to pay. There's no allegation here that any homeowner, whether current or future, is not going to pay for the services offered by the district, nor is not going to pay for the water provided by the district. So that distinguishes this from the Mueller case. But the initial part where we're sitting here is, did Mueller have standing to bring the action? And clearly we said yes. You said yes because the property that was identified there was the water. And what you said was there was water that was being sold, but proper compensation wasn't being paid for that water. It was almost like a collection case. Right. There's no allegation here that the water that the sanitary district sells or the services it provides aren't going to be paid for by the future residents or by the homeowners. So what we have here is we don't have the necessary property to come under that public trust doctrine. Well, there's an earlier definition from the Papeki case, and I think counsel referred to the case, but it defines the public trust doctrine is when a state, and so we'll put sanitary district or properly identified, holds a resource which is available for the free use of the general public, a court will look with considerable skepticism upon any governmental conduct which is calculated either to reallocate that resource to more restrictive uses or to subject public uses to the self-interest of private parties. Tell me how, I mean, you said that they own the facility. It's been transferred back. And I'm assuming, but I can't make a decision today about that, I don't think, because we're not at that stage, but if they were going to get paid back for that by some collection fees, when does the payback stop? And so when is there not, when is this public property not being used for the self-interest of private parties? Well, I guess, Your Honor, and my question goes back to what is the public property you're talking about? Are you talking about access to the district? No, the ability to produce water, to produce, not produce, but to deal with waste, and the money that is generated from those proceeds. But that's not what we're talking about here. How do we know that? Because that's not what plaintiff's complaint's alleging. There's no allegation that the money generated from the sale of water, from the processing of sewer services or anything like that is impacted at all by plaintiff's claims. It's the collection fee. It's the connection fee. Pardon me. Connection fee, the ability to connect into the system, which, again, the developer owns the connection permits, and they sell those connection permits for a fee. Only because Wasco gave that to them at some point. That was part of the annexation agreement in 1994, Your Honor. And now is that a public document? Yes, it is, and it's part of the record. And was that the tradeoff for them using private funds to build the infrastructure? Presumably, yes. Going back 1994, presumably I would assume that. The agreement doesn't specifically state that. It says that in exchange, I don't know off the top of my head whether it says exchange for, but I believe that is the case, Your Honor. But one of the questions I think that he's raising is, even if that's the case in that annexation agreement, it doesn't properly identify what it's going to cost and are they profiting from their ability to build that, and should that profit in the connection fees somehow come back to the district? And I would suggest to that, I would suggest in response, Your Honor, how is that precluded? Precluded? From what? Why can't they? It's a negotiation. Correct, exactly. But it's a negotiation with somebody else's property, allegedly. Well, the property that they have is the right to hook into the district, if that's the property that we're talking about. But let's now take this full circle. How does that benefit Ed Fiala at the end of the day on the standing issue? I think what we're getting to here is more kind of the merits of the case. How does that benefit the plaintiff here? We're not there yet. I understand that. And I know your co-counsel here is going to argue that, but I mean, we're at a 619. This is what it is, and what interest does he have in it? And other cases have said we don't look at necessarily the outcome, but we look at the interest of the petitioner, who would be Mr. Fiala. And I really want to take you all the way back, Your Honor, to say what is, if he succeeds in this case, what has he said he wants to happen? He says he's suing on behalf of the sanitary district. Okay? It's not a QTAN action. And the only other way you can bring a taxpayer derivative action is if there's a statute allowing it. That gets into the Recovery of Fraudulently Obtained Funds Act. But how is this one of those funds? Well, that's my question. I don't think it is. But that's not the only way. Well, okay. If it's taxpayer derivative, that may be the only way. But if it's strictly public trust and taxpayer, there is another way. And that is, if he has an actual and substantial interest as distinguished at one who has a nominal interest in the litigation, what is his actual and substantial interest in this case? Are his services going to be affected? They will not, and it hasn't been alleged so. What would you say would be a substantial interest? If for some reason his services were going to be affected. He's saying his substantial interest is that his water bill is going to go down. Let's make the assumption, first of all, that the funds that we're talking about were, as he alleged, bribes and kickbacks, which don't find their way into the public coffers in the first instance. What happened to his federal claims? The court said that they did not have standing under the federal RICO claim. And I'm glad you brought that up, Your Honor, because the court certainly did not infer that as to the remaining claims, there was standing. The court was very careful in limiting his opinion to say that Mr. Fiala did not have standing under the federal RICO Act only and did not proceed beyond that. Any other questions? Thank you. Thank you, counsel. Mr. Griffith? Thank you. Good morning. May it please the court. Pat Griffith, I represent what we commonly refer to as the B&B defendants. I'm going to limit my remarks this morning to a very narrow, but I think important issue given the history of this litigation, and that is whether, pursuant to Supreme Court Rule 273, the trial court's involuntary dismissal for a reason other than lack of jurisdiction, improper venue, or failure to join an indispensable party operates as an adjudication on the merits. We submit that it does, and I would hasten to add that despite our citation to several Illinois Supreme Court and appellate court decisions directly on point which actually address Supreme Court Rule 273, plaintiff failed below to address or distinguish those cases, has failed again on appeal to even address or distinguish those cases. Rule 273 is straightforward. It says, quote, Unless the order of dismissal of a statute of this state otherwise specifies an involuntary dismissal of an action other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join an indispensable party, operates as an adjudication upon the merits. Applying the plain terms of that statute, that rule, to the decision of the trial court is quite straightforward. The trial court's order found, and again I quote, Plaintiff has not alleged injury to a legally cognizable interest or a personal claim, status, or right that is capable of being affected by the grant of such relief. Instead, plaintiff seeks to assert rights that would unquestionably belong to the WSD as the party which, if the allegations were proven, suffered injury as a result of the defendant's conduct. Quoting further a relevant part, For the reasons stated in the findings above, the defendant's motions to dismiss are hereby granted, and Fiala's claims in counts 1, 2, and 3 of the Third Amendment complaint in 10L.223 are dismissed with prejudice as to all parties. And it goes on to carve out an exception under Rule 273, which is permissible as to the Wasco Cemetery District. Plaintiff cannot escape the clear and unambiguous dictates of Rule 273. But doesn't the judge in his last sentence in his order say motion to dismiss granted to all defendants without prejudice? No, he does not. I'm not sure which order you're looking at, Your Honor. His order dated February 28th of 2013. Right, that order was vacated, and the final order that is being appealed is a June 21st, 2013 order. And that order specifically states, as I've just said, that all the defendant's motions are granted with prejudice as to all parties. And the only carve-out is in Paragraph 5 of the final findings, which states that pursuant to Supreme Court Rule 273, this order is not an adjudication on the merits as to the rights of the Wasco Cemetery District. Very happy to discuss any of the cases that I've cited. Inferentially, then, you're saying that it would be as to the other defendants. Absolutely. And one of you has asked a question of counsel for the plaintiff. What effect does the federal court's decision have on the trial court findings below? And interestingly, the only case cited by a plaintiff that actually did address Rule 273 was the River Park case. And in the River Park case that the court there specifically held, that was a case where a developer originally sued the village for a violation of Section 1983. But the federal court dismissed those two counts. The plaintiff then refiled his claim. It wasn't remanded. It was refiled in state court, and it was a six-count complaint that was then enlarged to a seven-count complaint. And there the court held on appeal that the federal court's decision, dismissing the plaintiff's claims in federal court, pursuant to Supreme Court Rule 273, was an adjudication on the merits and dismissed the plaintiff's claims. But here he only dismissed the RICO claims, correct? He did only dismiss the RICO claims, but he dismissed them for lack of injury, which in that case ended up being a failure to show RICO standing. But whether it's a lack of injury for RICO or lack of injury for any of the state court claims, which is exactly what we all argued below, if you fail to allege a proper injury, you have no standing. But you don't have to. According to the progression of the cases, you don't have to allege a special damage or a special injury anymore. What you have to allege under the public trust document is either public property or property that has otherwise been funded by public funds. And I would encourage you, Roberts, to review. Obviously, Mr. Bressler did a good job of distinguishing the Mueller case from the case at hand. I would encourage you to read Defendant Harrison's brief on that issue as well. There are at least four critical distinguishing factors between this case and the Mueller case, the two most important of which are there were never any public funds used for these improvements, and the funds that the plaintiff is claiming were diverted were never public funds. They were never in the public coffers, and therefore they're not subject to the public trust doctrine. All right. And, again, although your point is that this dismissal was a final adjudication on the merits, we're here primarily to determine, I mean, just as in Mueller, Mr. Mueller or Mrs. Mueller lost the case. The city won the case. But the issue was did they have standing to bring the case. Right. And what I'm saying is this, and maybe I can explain here. I'm not suggesting that the trial court made any determinations otherwise on the merits of Mr. Fiala's underlying claims. What I'm saying and what all the cases that I've cited to say is that where there was an involuntary dismissal as to something other than jurisdiction, improper venue, or failure to join an indispensable party, that acts as an adjudication on the merits. And so when you look at any case that's alleging res judicata effect, you must have identity of parties, identity of cause of action, and the third element, which is what Rule 273 looks at, is was there an adjudication on the merits. Rule 273 indicates that in this case, whether you got to any of the other underlying issues or not, because there was an involuntary dismissal for something other than those three issues, it is, in fact, an adjudication on the merits. But if the trial court was wrong on the standing issue, then we're almost back at square one. Yeah. I mean, I think that would be the case. We'd have to go back. Although I will tell you that a different judge, and this is why I think the River Park case is important, Judge Feinerman from the Federal District Court has already ruled, and that order has never been appealed, that there is no injury. And so, again, it's a lack of standing. But how could he rule that there was no injury under state claims when he chose not to? He chose to remand them. He only said there was no injury under reto. Because I think he might be different injuries. Well, injury is injury. Whether you're claiming that your injury, then, is actionable under reto or some other claim, the injury here was alleged to be PEs were stolen from me. Now, that claim has sort of changed as each complaint is filed. But never has there been an injury alleged that is unique to Mr. Fiala. And until that happens, there's no standing. And why does he have to say it's unique to him when we don't have to allege, but more importantly, they don't have to prove special injury or special damage anymore? Well, I think that gets back to the whole public trust doctrine. And, again, I think the facts of this case are easily distinguishable from the Mueller case. And just your Honor asked a question about, well, was this a bargain for exchange? In other words, were the B&B defendants granted these permanent rights as a consequence of rebuilding the system? And I would refer your Honor to the common law record at pages 74 and 75. That is Exhibit A to Mr. Fiala's complaint. Exhibit A is the annexation agreement dated 1994, negotiated in a time where none of these defendants had anything to do with that annexation agreement in terms of trustees on the board or anything like that. That agreement at pages 24 and 25 of the agreement, 74 and 75 of the common law record, clearly states that if the developer defendants, if the developer parties to that agreement, construct a wastewater system, in exchange for that, they are to be given these permits. So it never was sanitary district property. It was always the property of the defendants, which they gained by a bargain for exchange in the agreement and then performing under that agreement. And Mr. Griffin, are you the Patrick Griffin who is listed as one of the parties here? I am. Because I wasn't sure and I just wanted to be sure for the record. Thankfully, it's not my younger son. Do you have any questions? Thank you. Thank you very much. Thank you. Mr. Newman. Mr. Newman, while you're getting yourself some water, I want to ask you, I am sure that there are a lot of agreements or contracts that sanitary district or the village that your client lives in aren't the type of agreement he may have entered into. So does that give him the right to sue every time that he feels that somebody in the district, whatever capacity they serve, may have been able to get a better deal and they didn't? No, not at all. That's not what this case is about. Let me make something really, really clear that counsel has misstated. First of all, the Exhibit 1 to our complaint, which has the annexation agreement attached, I think it's Exhibit 1 to that agreement is the quote unquote reimbursement agreement. It's not signed and it never has been signed because it's illegal. They make reference to an act which has no application at all, the County Sanitary District Act, which interestingly enough, the County Sanitation Act, which doesn't apply here, had the right of reimbursement for the developer. That's why they signed it. But the act doesn't apply. The Sanitary District Act of 1936 applies, and the Sanitary District Act of 1936, at the time of this annexation agreement, which everybody here will agree to, and it's off the public record, did not allow for reimbursement. That's the key thing. It was illegal. There were other acts that did. The act was later amended, maybe five years later, and they then allowed for reimbursement. So this particular annexation agreement, at the time it was signed, there was no right for reimbursement at all. No. So you're not saying five years after 1936, but five years after 1994. Correct. Five years after this agreement was signed, the 1936 act was amended. It's all part of my brief. Or the complaint. It's not part of the brief, but it's part of the complaint. It was amended. So the whole notion that they had this right of reimbursement is poppycock, and that's the best word I can use, Judge, because that's what this is. This is so crystal clear, the act here. Well, I'd love to, I mean, at this point you're raising questions about your merits, and we're not there yet. I mean, how does that relate, then, to your client's standards? What is his interest? Well, let's go back to what Mr. Bressler, the Sanitary District, mistakes what the complaint alleges. Nowhere in this complaint does it allege that the interest that FDL has has anything at all to do with a bribe. It doesn't say that. It says just the opposite. And if you have my complaint in front of you, I'll read it. It says. Well, I'm going to stop you there. You didn't include your complaint in your brief, did you? As an attachment? No, you didn't. To all parties who are present here, if your complaint is going to be part of the issue, it really should be part of your brief. My mistake, Judge. I apologize. I thought that I did, but I didn't notice that it wasn't when I was preparing. It's in an appendix, but it's not. I mean, I can't grab it right here and look at it. I think part of the reason why I didn't, Judge, maybe just because my complaint with the exhibits is a false. I understand that, but then there's something, you know, but you want us to read it, and we have, but we had to go searching for it, which isn't onerous, but it's something that would have been easier. I apologize. Well, let me read you a relevant complaint, which is Paragraph 84. Again, contrary to what the Wasco Sanitary District is up here saying, the complaint alleges, which is taken as true, that at all relevant times the Wasco Sanitary District imposed a fee to the public. That's Paragraph 84. Then Paragraph 86, when you go through, or 87, excuse me, says that they misappropriated that fee and basically gave it to B&B, which is the next paragraph. That's what this case is about. It's about $12 million that should have gone to the connection fees, should have gone, and it's Mueller on its face. The attempts to distinguish Mueller, one thing that they didn't say, and I would love, I'd give them my time right now to come up and explain to them if they want. What was the substantial interest in Mueller? They're talking about, oh, there's no substantial interest, there's no substantial interest. Really? What was the substantial interest in Mueller? The same as it is here. The interest is in that money, the tax money that's supposed to come to coffers. Well, in that case it was about $0.20 or $0.30 a gallon, I think, but here, I mean, but again, you do know that Mueller didn't win. Mueller won the standing argument. Right. And the only thing my client wants is his name in court. These allegations of facts and merit of the case, you know, we have confidence we're going to win it because the documents are what they are. But this case is not about bribes. It's nothing to do with that. It's about the money, those fees that were paid, which are public funds, the sanitary district charged. This is a pay-to-play scheme. But you do make allegations about bribes. I mean, you can't deny that you make them. The bribes were going towards whether or not the trustees should be removed. That's documents as well. The trustees were given land. We have the deeds while they were voting, and the person who gave them the land was B&B. And then these trustees then voted to give B&B $12 million. And at the same time, these trustees were all related to B&B. And that's part of the declaration to have them removed. At the end of the day, we go back to what this case is about, the ability of a taxpayer to say, hey, public officials, you've been elected, you're misappropriating funds, you can't do that. And that's the whole public trust doctrine on its face. And for that reason, I'd ask that the court reverse and give Ed Fiala his day in court so that the sanitary district and the defense can prove that they didn't do wrongful conduct. And we'll prove that they did. Well, actually, you have to prove that they did. And we will prove that they did. Thank you. Thank you, gentlemen, for your argument this morning. We will take the matter under advisement, and we will issue a decision in due course. Thank you. Thank you. We are now adjourned.